# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 25-5078

September Term, 2025

FILED ON: JULY 17, 2026

KAREN SPENCER,
APPELLANT

v.

DOUGLAS A. COLLINS,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:23-cv-019998)

Before: SRINIVASAN, *Chief Judge*, and PAN and GARCIA, *Circuit Judges*.

## J U D G M E N T

This appeal was considered on the record from the United States District Court for the District of Columbia and on the parties' briefs and arguments. The panel has accorded the issues full consideration and has determined that they do not warrant a published opinion. *See* D.C. Cir. R. 36(d). It is hereby

**ORDERED AND ADJUDGED** that the district court's order dismissing appellant Karen Spencer's complaint be **AFFIRMED**.

I.

A.

We draw the following facts from the operative complaint, accepting its allegations as true at this stage. *See Barker v. Conroy*, 921 F.3d 1118, 1121 (D.C. Cir. 2019).

Karen Spencer, an African American female, was employed as a nurse practitioner at the VA Medical Center in Washington, D.C., from August 2006 until July 2019. Amended Compl. ¶¶ 4, 6. During the period relevant to this appeal, Spencer's direct supervisor was Dr. Dominique Neptune, an African American female, and her second-line supervisor was Dr. Charles Faselis, a

white man. *Id.* ¶ 10. Michael Heimall, a white man, was the Facility Director with final authority over personnel decisions. *Id.* ¶¶ 13, 19.

At the VA, Spencer was trained to perform "trigger point injections" using an "anesthetic or dry needle" to "palpat[e] scar tissue in hopes of relieving pain." *Id.* ¶ 7. In June 2018, Spencer performed a trigger point injection on a veteran who arrived for an appointment in considerable pain. *Id.* ¶ 11. She did so in her administrative office rather than in the designated treatment room, which was in use at the time. *Id.* ¶ 17. After performing the injection, Spencer "accident[ally] left the capped syringe in her office," where it was later discovered in a "routine safety inspection." *Id.* ¶¶ 11–12.

Discovery of the syringe prompted an investigation into whether Spencer had violated the Center's rules by performing the injection in her office. *Id.* ¶ 12. Neptune placed Spencer on a performance improvement plan, which meant she was "not allowed to practice" from June until August 2018. *Id.* While Spencer "demonstrated improvement" over that period, she was "not removed from" the performance plan. *Id.* In December, Spencer inquired about her status with Faselis, who told her: "[Y]ou are going to be on [the performance plan] for a long time. The providers here see you as a problem child and no one wants you here." *Id.* ¶ 14. Spencer responded that she felt the Center "was discriminating against her because of her race," which led Faselis to believe that she was "accusing him of being a racist." *Id.* ¶ 15.

After that December meeting, Faselis "took steps to . . . initiate a second investigation" of the syringe incident. *Id.* The second investigation violated VA policy because it took place more than 120 days after the syringe incident, Faselis did not obtain proper authorization to conduct it, and Spencer was not made aware of or "allowed to participate" in it. *Id.* Despite those deficiencies, Faselis relied upon the results of the second investigation to recommend that Heimall formally suspend Spencer's practice privileges. *Id.*

Heimall accepted the recommendation, and in January 2019, Spencer was notified of her suspension. *Id.* ¶¶ 15–16. As a result, Spencer was "prohibited from being in contact with any patients" and her "office was taken away." *Id.* ¶ 17. The stated reason for the suspension was that Spencer had not been approved to perform trigger point injections and thus had been "practicing outside of" her scope of practice. *Id.* ¶ 16. Invited to respond to that finding, Spencer maintained that she in fact had been approved to perform the injections. *Id.* Heimall nevertheless extended her suspension in March, citing "significant concerns regarding [ ] Spencer's clinical practice and clinical judgment." *Id.* ¶ 18. The suspension was extended for a third time in early May. *Id.*

Heimall ultimately terminated Spencer's employment effective July 2019, based on the same conclusion that she had practiced beyond her approved scope of practice. *Id.* An internal review board upheld Spencer's termination. *Id.* ¶ 20.

3

B.

In July 2023, Spencer filed suit in district court against the Secretary of Veterans Affairs. Her complaint included various claims under Title VII, including a claim of race discrimination related to her May 2019 suspension and claims of race discrimination and unlawful retaliation related to her July 2019 termination of employment.

In January 2025, the district court granted the Secretary's motion to dismiss the complaint for failure to state a claim. The court determined that Spencer had exhausted her administrative remedies only for the three claims just mentioned and, for that reason, her remaining claims could not be considered. On the merits of the three properly presented claims, the court held that Spencer's complaint failed to plausibly allege that her suspension or termination resulted from race discrimination or that her termination resulted from retaliation, as opposed in each case to legitimate discipline.

II.

We review the district court's dismissal of Spencer's complaint for failure to state a claim de novo. *See Keren Kayemeth LeIsrael—Jewish Nat'l Fund v. Educ. for a Just Peace in the Middle E.*, 66 F.4th 1007, 1013 (D.C. Cir. 2023). We assess whether, based on the allegations in Spencer's complaint, her claims "rise 'above the speculative level.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A complaint can establish a facially plausible claim only if it sets forth 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 272 (D.C. Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

As a threshold matter, we identify the claims before us in this appeal. Spencer's appellate briefing is unclear on whether she intends to take issue with the district court's conclusion that she failed to administratively exhaust several of her claims. At oral argument, Spencer's counsel clarified that she presses on appeal only the three claims the district court considered on the merits: the claim of race discrimination related to her May 2019 suspension, and the claims of race discrimination and retaliation related to her employment termination. *See* Oral Arg. Tr. 12–13; Oral Arg. Rec. 11:45–13:12.

To succeed on those claims, Spencer ultimately must show (1) that she brings a claim based on a protected classification (for discrimination) or she engaged in a protected activity (for retaliation); (2) that she suffered an adverse employment action; and (3) that the cause of the adverse action was discrimination or retaliation. *See Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (discrimination); *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007) (retaliation). The parties do not dispute that Spencer's race is a protected classification under Title VII, that raising her complaint about race-based treatment to Faselis was an activity protected against retaliation, and that her suspension and termination count as adverse actions. Thus, our assessment of Spencer's complaint turns on the third prong—whether the complaint's allegations "support a

reasonable inference of causality" with respect to discrimination or retaliation. *Pueschel v. Chao*, 955 F.3d 163, 167 (D.C. Cir. 2020); *see also Joyner v. Morrison & Foerster LLP*, 140 F.4th 523, 530 (D.C. Cir. 2025). We conclude they do not.

A.

We start with Spencer's two race-discrimination claims related to her suspension and termination, for which her causation arguments entirely overlap. In Title VII discrimination cases, plaintiffs may prove causation "by direct or circumstantial evidence." *Oviedo v. Wash. Metro. Area Transit Auth.*, 948 F.3d 386, 394 (D.C. Cir. 2020). Spencer's complaint contains little direct evidence. She alleges that Faselis called her a "problem child" whom "nobody wanted" at the Center. Amended Compl. ¶ 14. But that remark is "neither explicitly racial nor infused with racial undertones based on common usage," and we cannot "infer discriminatory intent if the words uttered are plainly lacking in racial animus." *Hairston v. Vance-Cooks*, 773 F.3d 266, 274 (D.C. Cir. 2014). Nor does the complaint allege any other statement on the part of Spencer's supervisors that "itself shows racial . . . bias." *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011).

Spencer instead relies on indirect evidence in the form of purported "comparators." A comparator theory asks a court to "infer racial discrimination from allegations" that the plaintiff "was treated differently from similarly situated employees outside his protected class." *Joyner*, 140 F.4th at 529 (cleaned up). To survive a motion to dismiss, it is not "enough to simply allege that the plaintiff was treated differently from a 'similarly situated' comparator, without additional allegations showing the comparators are in fact 'similarly situated' in some meaningful respect." *Id.* at 531. Spencer therefore must have "plead[ed] enough facts about [the] comparators and the relevant context to allow a plausible inference that [she] was treated differently because of [her] race." *Id.* at 530; *see also L. Xia v. Tillerson*, 865 F.3d 643, 660 (D.C. Cir. 2017). Her complaint falls short.

Spencer first points to a medical resident—a white female—who failed to properly treat a veteran's leg, resulting in its amputation. Amended Compl. ¶ 19. Although Faselis and Heimall knew that the resident had "failed to provide or meet the standard of care," Spencer alleges, the resident was not "written up, investigated[,] or terminated." *Id.* Those allegations, however, do not establish that the resident had a similar role to Spencer or engaged in comparable misconduct. As for their roles, Spencer's complaint simply asserts that "[a]s a nurse practitioner, [ ] Spencer and the resident functioned basically the same." *Id.* That sort of "naked assertion[ ] devoid of further factual enhancement" cannot survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (cleaned up); *see Joyner*, 140 F.4th at 532 (plaintiff's complaint failed to show he and putative comparators "worked in the same position in a meaningful sense"). As for their conduct, Spencer asserts that the resident's error had more severe medical consequences than her own. That may be so, but Spencer violated the Center's policies designed to ensure patient safety. The resident, by contrast, made an error in medical judgment. However harrowing its results, the resident's action is different in kind than Spencer's. Spencer makes no attempt to explain why the two types of actions

are of "comparable seriousness" for purposes of assessing whether Spencer and the resident are similarly situated. *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1118 (D.C. Cir. 2016). Accordingly, the allegations about the resident do not raise "more than the mere possibility" that Spencer was subjected to unusually harsh discipline because of her race. *L. Xia*, 865 F.3d at 660 (internal marks and citations omitted).

Second, Spencer alleges that unnamed "nurses did not properly dispose of syringes" but were "not disciplined" and instead received only "verbal counseling." Amended Compl. ¶ 20. Critically, though, the complaint does not allege those nurses' race(s), as would be required to assess whether they could be appropriate comparators. *See, e.g.*, *Joyner*, 140 F.4th at 531–32; *L. Xia*, 865 F.3d at 660. Nor does Spencer allege that she and the other nurses were "differently disciplined *by the same supervisor[]*." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 302 (D.C. Cir. 2015) (emphasis added); *see also Joyner*, 140 F.4th at 533. In fact, her complaint asserts that the other nurses' misconduct was never "escalated" to Faselis or any other supervisor. Amended Compl. ¶ 20. The allegations about the other nurses thus cannot support an inference that Faselis or Heimall, the relevant decision-makers for Spencer's discrimination claims, treated her differently because of her race.

## B.

We next consider Spencer's retaliation claim related to her termination. Like with discrimination, a plaintiff may establish retaliatory causation via either direct or indirect evidence. *See Pueschel*, 955 F.3d at 167–68. Lacking direct evidence, Spencer relies on a common form of indirect evidence: the fact that a protected activity (her complaint to Faselis) was followed by an adverse action (her termination). "[T]emporal proximity," however, can "support an inference of causation" only when the "two events are *very close in time*." *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012) (cleaned up; emphasis added). The temporal gap between the asserted cause and effect generally cannot exceed three months. *See, e.g.*, *Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009); *Ho v. Garland*, 106 F.4th 47, 52 (D.C. Cir. 2024); *Spence v. Dep't of Veterans Affs.*, 109 F.4th 531, 540 (D.C. Cir. 2024). Here, the gap measures at least six months— from the complaint to Faselis in mid-December 2018 until the termination decision, which Spencer suggests was finalized in June or early July 2019.

Spencer counters that intervening events—the second investigation and three suspensions— bridge the period between her protected activity and her termination. We have previously assumed without deciding that such a bridging theory is available for a Title VII retaliation claim, *see Spence*, 109 F.4th at 540, and we can do the same here. Even if the temporal period in this case is properly measured as the one to two months between Spencer's protected activity and each of the bridging events culminating in her termination, she still fails to state a claim. That is because, rather than looking at temporal proximity "in isolation," we must view the complaint "as a whole" to determine whether it "dispel[s] any obvious alternative explanations" for the adverse employment actions Spencer suffered. *Ho*, 106 F.4th at 51, 54 (cleaned up). And the other allegations in Spencer's complaint undermine any inference of causation arising from the temporal

proximity, while failing to dispel the most obvious alternative explanation—that she was subject to legitimate discipline for misconduct.

For one thing, temporal proximity generally does not suggest retaliatory causation unless the decision-maker who imposes the adverse action had knowledge of the prior protected activity. *See, e.g.*, *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009); *Coleman v. District of Columbia*, 794 F.3d 49, 64 (D.C. Cir. 2015). Spencer does not allege that anyone other than Faselis knew of her complaint. *See* Amended Compl. ¶¶ 15, 33. Faselis, though, was solely responsible for initiating only the second investigation; subsequent decisions about the suspensions and termination were made principally by Heimall. *Id.* ¶¶ 16–18. Nor does Spencer allege that, for each of the suspensions, Heimall merely ratified tainted recommendations made by Faselis. The apparent disconnect between Spencer's protected activity and her later suspensions undermines her attempt to cast them as fueled by the same retaliatory motive.

Moreover, Spencer herself suggests that all the adverse actions traced to the syringe incident, which would mean the relevant disciplinary sequence originated *before* her protected conduct. When protected activity is followed by decision-makers simply "proceeding along lines previously contemplated, though not yet definitively determined," that typically is "no evidence whatever" of retaliation. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001). Assessing each disciplinary step that followed Spencer's complaint in light of the events that preceded it, there is no sound basis to draw an inference of retaliation. For instance, while Spencer points to procedural defects that allegedly marred the second investigation as evidence that it was motivated by retaliation rather than legitimate discipline, *see* Amended Compl. ¶ 33, she also alleges that the first investigation was handled improperly even before she engaged in protected activity, *see id.* ¶¶ 12, 14. And by alleging a single sequence of discipline tracing to the syringe incident, Spencer fails to "dispel" the "obvious alternative explanation[]" that she was disciplined as a result of misconduct. *Ho*, 106 F.4th at 54 (cleaned up). At bottom, even giving Spencer the benefit of a bridging theory, no degree of temporal proximity between the protected activity and termination could give rise to a plausible inference of retaliatory causation in this context.

\* \* \* \* \*

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate until seven days after resolution of any timely petition for rehearing or rehearing en banc. *See* Fed. R. App. P. 41(b); D.C. Cir. R. 41(b).

**Per Curiam**

                                      **FOR THE COURT:**
                                        Clifton B. Cislak, Clerk

BY:   /s/
          Daniel J. Reidy
          Deputy Clerk